*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-5080

MONUMENTAL LIFE INSURANCE COMPANY,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 01-00014—Jennifer B. Coffman, District Judge.

Argued: February 2, 2006

Decided and Filed: March 3, 2006

Before: MERRITT, MARTIN, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Kevin L. Smith, HINES, SMITH LLP, Costa Mesa, California, for Appellant. John A. Dudeck, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kevin L. Smith, HINES, SMITH LLP, Costa Mesa, California, David B. Tachau, Kevin M. Norris, TACHAU, MADDOX, HOVIOUS & DICKENS, Louisville, Kentucky, for Appellant. John A. Dudeck, Jr., Frank P. Cihlar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Monumental Life Insurance Company appeals from the district court's order enforcing an administrative summons issued by the Internal Revenue Service (IRS). The summons requested voluminous documents from Monumental, a third party in the IRS's investigation of Johnson Systems, Inc. On appeal, Monumental argues that the district court erred in rejecting the magistrate judge's findings that (1) the IRS already had in its possession many of the documents requested, and (2) the IRS's summons was overbroad in that it sought documents not relevant to the investigation of Johnson. Monumental also contends that, even if we were to affirm the district court's decision, a protective order should be imposed upon any proprietary materials that Monumental is required to provide to the IRS. For the reasons set forth below, we **REVERSE** the judgment of the district court and deny enforcement of the IRS summons.

1

## I. BACKGROUND

In November of 1999, the IRS served a third-party summons on Monumental in the civil investigation of Johnson's tax liability for the tax years from September 30, 1994 through September 30, 1997. The investigation focused on whether Johnson had properly taken income tax deductions for the contributions it made to its employee welfare benefit plan. Johnson's plan used employer contributions to purchase three different Monumental life insurance products for its employees: (1) the Continuous Group Term product (C-Group), (2) the Millennium Group 5 product (MG-5), and (3) the Signet 24 Group Life Insurance product.

John Marien, an IRS agent who specializes in investigating improper uses of employee benefit plans, explained in an affidavit that these types of insurance arrangements can be characterized as employee welfare benefit plans, deferred-compensation plans, or vehicles that hold assets for select employees. The classification of the insurance arrangement affects the tax consequences that attach. These arrangements are often used to disguise tax-avoidance schemes. Marien believed that the same types of life-insurance products provided by Monumental to Johnson were involved in the case of *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). In that case, the Tax Court held that the contributions made by two professional medical corporations into an employee benefits program were disguised taxable dividends and not deductible expenses by the employer. 299 F.3d at 231-33.

Employers are not generally prohibited from funding term life insurance policies for their employees and deducting the premiums paid as business expenses. The magistrate judge explained, however, that an "unlawful twist" occurs when small businesses, in which the employees are generally the owners, buy term-insurance policies at inflated premiums and then place the amount in excess of the reasonable cost of the insurance risk into an investment account for the employees. In those cases, employers are disguising investments that accumulate cash value as deductible benefit-plan expenses.

To investigate whether Johnson's deductions exploited this unlawful twist, the administrative summons requested 172 categories of documents, including subparts, from Monumental. A copy of the summons is appended to this opinion. Some of the document requests related specifically to Johnson's insurance policies, while others related generally to the C-Group and MG-5 products that Monumental offered to many of its customers. For example, item 3(a) of the summons sought, in relation to Monumental's C-Group product, "[a]ll documents memorializing, describing, identifying and/or listing the insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999." This request, covering all of Monumental's customers who used the C-Group product during the time span identified by the IRS, was intended to better inform the IRS about how the product was generally administered by Monumental. Marien claimed that this information would help determine whether Johnson was deducting the proper amount as a business expense.

Monumental moved to quash the summons. After the district court dismissed Monumental's motion, Monumental delivered approximately 350 pages of documents to the IRS. Monumental also expressed a willingness to produce more documents if the IRS would place them under a protective order to keep the proprietary information confidential. This the IRS was unwilling to do. Moreover, the IRS was displeased with Monumental's production of an insignificant portion of the requested documents, so it filed a petition to enforce the summons in April of 2001. Attached to this petition was Marien's affidavit. Marien averred that Monumental's full compliance with the summons would assist the IRS in characterizing the arrangements made by Johnson in order for the IRS to determine the tax consequences. In addition, he declared that the documents sought by the summons were not already in the possession of the IRS in a form useable to investigate Johnson.

Monumental raised several objections to the enforcement of the summons, prompting the district court to refer the case to a magistrate judge. In August of 2003, after lengthy proceedings that included six hearings, further production of documents by Monumental, and an attempted settlement between the parties, the magistrate judge issued his findings of fact, conclusions of law, and recommendations. The magistrate judge concluded that (1) the summons did not suffer from technical difficulties, (2) the IRS did not issue the summons in bad faith, (3) the government already had a portion of the requested documents in its possession because of the *Neonatology* investigation, and (4) some of the documents that the government requested were irrelevant to the investigation. Because the magistrate judge did not believe that partial enforcement of the summons was legally permissible, he recommended that the district court deny enforcement in full. He also recommended that the district court not require a protective order, if the summons were to be enforced, because placing a condition on the enforcement of an IRS summons is improper according to the Ninth Circuit decision in *United States v. Jose*, 131 F.3d 1325, 1329 (9th Cir. 1997).

The government then filed an objection to the magistrate judge's recommendation. In October of 2004, the district court declined to follow the recommendation of the magistrate judge and entered an order enforcing the summons in full. The district court, applying a de novo standard of review, rejected the conclusions of the magistrate judge that some of information sought by the IRS was irrelevant and that the IRS possessed some of the documents requested in a form that it could use in the Johnson investigation. Monumental now appeals.

## II. ANALYSIS

### A.      Standard of review

A district court's order enforcing an IRS summons will not be reversed unless clearly erroneous. *Wagenknecht v. United States*, 22 F. App'x 482, 483 (6th Cir. 2001) (unpublished) (citing *Fortney v. United States*, 59 F.3d 117, 119 (9th Cir. 1995)). Clear error exists if we are "left with the definite and firm conviction that a mistake has been committed." *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 402 (6th Cir. 1999). Issues of statutory interpretation, however, are reviewed de novo. *Fortney*, 59 F.3d at 119.

### B.      Prima facie case for summons enforcement

In order to ensure the proper determination of tax liability, Congress "has endowed the IRS with expansive information-gathering authority." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984). Section 7602 of the Internal Revenue Code, 26 U.S.C. § 7602, is the "centerpiece of that congressional design." *Arthur Young,* 465 U.S. at 816. Under § 7602, the Commissioner of the IRS is authorized, "[f]or the purpose of ascertaining the correctness of any return . . . , [t]o examine any books, papers, records, or other data which may be relevant or material to such inquiry" and to summon any person to produce such documents. 26 U.S.C. § 7602(a)(1) & (2). The summons power is not limited to the taxpayer under investigation, but may also be issued to a third party who has relevant information. 26 U.S.C. § 7602(a)(2).

The courts, and not the IRS, are authorized to enforce this summons power. *United States v. Will*, 671 F.2d 963, 966 (6th Cir. 1982) (affirming the district court's enforcement of a summons over the taxpayer's objection that the summons was issued in bad faith). In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court enunciated the analytical framework that governs enforcement decisions. First, for the government to establish a prima facie case for enforcement, it must demonstrate that (1) the investigation has a legitimate purpose, (2) the information summoned is relevant to that purpose, (3) the documents sought are not already in the IRS's possession, and (4) the procedural steps required by the tax code have been followed. *Id.* at 57-58. "The requisite

showing is generally made by the submission of the affidavit of the agent who issued the summons and who is seeking enforcement." *Will*, 671 F.2d at 966.

Once the government has made this prima facie showing, the burden shifts to the party being summoned to either disprove the elements of the prima facie case or "demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process." *United States v. Davis*, 636 F.2d 1028, 1034 (5th Cir. 1981). In this case, Monumental claims that the IRS has failed to establish a prima facie case for the reasons discussed below.

### 1.          *Alleged insufficiency of the agent's affidavit*

Monumental first argues that Marien's affidavit in support of the petition to enforce the summons is insufficient because Marien was not the agent who issued the summons. Agent Lola Lee, who issued the summons, did not prepare the affidavit. But Marien is a specialist in the tax treatment of employee benefit plans and was specifically assigned to the Johnson investigation. Although this court's authority on point states that the agent who issued the summons is an appropriate person to establish a prima facie case for enforcement, *Will*, 671 F.2d at 966, there is no caselaw holding that another IRS investigator is incompetent to provide the requisite information.

Agent Marien had personal knowledge of the Johnson investigation and the documents needed to determine Johnson's tax liability. *See* Fed. R. Civ. P. 56 (requiring affidavits to be based on personal knowledge). Because Marien, the IRS's national specialist in this area, was competent to establish the *Powell* factors, his affidavit does not fail due to an alleged technical deficiency. The district court's reliance on the affidavit, therefore, was not clearly erroneous.

### 2.          *The Neonatology documents*

Monumental also argues that many of the documents sought by the summons are already in the possession of the IRS. Specifically, Monumental produced some of the general information regarding its products when the IRS was investigating Neonatology Associates (the Neonatology documents). Neonatology Associates used many of the same types of insurance arrangements as Johnson. The IRS does not dispute that it already has the Neonatology documents, but claims it does not possess them in a form that it can employ in the investigation of Johnson because of the confidentiality requirements of 26 U.S.C. § 6103.

Under 26 U.S.C. § 6103(a), federal tax returns and tax return information are confidential. "Federal employees may not disclose such information unless an exception is met, and a taxpayer has a statutory cause of action for damages" in the event of an unauthorized disclosure of return information. *Rowley v. United States*, 76 F.3d 796, 799 (6th Cir. 1996) (citation and quotation marks omitted); *see also* 26 U.S.C. § 7431(a) (imposing civil liability for disclosure of return information by a government agent). Return information includes "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits . . . or any other data" collected by the IRS with respect to a return or with respect to the determination of possible tax liability. 26 U.S.C. § 6103(b)(2)(A).

But return information does not encompass "data in a form which cannot be associated with or otherwise identify, directly or indirectly, a particular taxpayer." 26 U.S.C. § 6103(b)(2)(D). Moreover, an explicit exception to the confidentiality requirements is made for "inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1). Internal use by the IRS of the Neonatology documents in the Johnson investigation, therefore, would not violate the confidentiality requirements.

The IRS further argues, however, that "actual possession of or access to information by the IRS is not an absolute ban to enforcement of a summons for that information," quoting *Phillips v. United States*, No. 98-3128, 1999 WL 228585, at *3 (6th Cir. March 10, 1999) (unpublished). But the summoned taxpayer in *Phillips* produced no evidence to contradict the IRS agent's affidavit declaring that the IRS did not possess any of the requested information. *Id.* The quoted language in *Phillips* is therefore dicta, to say nothing of the fact that the case is also unpublished. *Phillips* is thus easily distinguishable from the present case, where the IRS does not dispute that it already possesses certain of the requested documents.

In addition, the proposition stated in *Phillips* that actual possession is not an absolute ban to summons enforcement derives from a Fifth Circuit case in which there was little evidence that the IRS actually had possession of the summonsed documents. *See Davis*, 636 F.2d at 1037 (enforcing a summons in part where the taxpayer did not request discovery as to whether the IRS possessed the questioned documents). The Fifth Circuit in *Davis* balanced the unnecessary harassment of the taxpayer inherent in a summons requesting already-possessed information with the need to expedite summons-enforcement proceedings to allow for effective investigations by the IRS. *Id.* at 1038-39. This balancing test was applied in another unpublished case from this circuit, *United States v. Alpha Medical Management, Inc.*, No. 96-5825, 1997 WL 359065, at *3 (6th Cir. June 26, 1997), which held that district courts *may* limit enforcement of a summons to documents not already possessed by the IRS, but that actual possession is not an absolute ban.

In the present case, the district court held that Monumental has not shown that the IRS "has practical means to access any [of the Neonatology documents, nor has Monumental] shown that production of these documents would work an unnecessary hardship on [Monumental]." But even assuming without deciding that this circuit would adopt the *Davis* balancing test, the burden must be placed on the government rather than on Monumental to prove that the government's interests outweigh Monumental's hardship. *See United States v. Theodore*, 479 F.2d 749, 755 (4th Cir. 1973) (holding that the obligation is upon the IRS to demonstrate that it has no practical way of obtaining the material within its possession). The government should bear this burden because Monumental has successfully shown that the IRS does, in fact, possess some of the requested materials in a form it can use in this investigation. Because Monumental has successfully rebutted the government's prima facie showing as required by *Powell*, the IRS must prove that, on balance, the Neonatology documents cannot be practicably accessed.

The IRS, by simply asserting that the Neonatology documents have been locked in a file somewhere, has not shown that the *Davis* balancing test weighs in its favor, even if we were to accept the government's argument that *Davis* applies. Although summons-enforcement proceedings are designed to be summary in nature and to be concluded quickly, *United States v. Kis*, 658 F.2d 526, 535 (7th Cir. 1981), the district court should not have dismissed Monumental's meritorious objections simply to "avoid a fresh round of litigation regarding exactly which documents the IRS already may have." Expediting an IRS summons is an important consideration, but it is not the only goal. Monumental, because it is a third party to the IRS's investigation of the taxpayer Johnson, deserves greater protection against a burdensome summons. *See United States v. Bisceglia*, 420 U.S. 141, 157 (1975) (holding that federal courts should scrutinize summonses issued to third parties with extra care) (superseded by statute on other grounds).

Finally, the IRS argues that the validity of a summons should be tested as of the time that it was issued. The summons to Monumental was issued in November of 1999, almost nine months before the Tax Court's decision in *Neonatology*, causing the IRS to claim that there is no proof that it possessed the documents at the time the summons was issued. It relies on *United States v. Kemper Money Market Fund, Inc.*, 781 F.2d 1268, 1278 (7th Cir. 1986) (assessing the validity of a summons as of the time that it was issued in affirming the denial of fees and costs to the taxpayer). But *Kemper* is inapplicable because it dealt with the question of whether a referral for criminal prosecution

invalidated a summons, an entirely different issue than the one before us.  *Id.*  The IRS cites no authority for the proposition that, in this equitable proceeding,  the panel may not consider the fact that the Neonatology documents are now in the IRS's possession.  *See Kennedy v. Rubin*, 254 F. Supp. 190, 194 (N.D. Ill. 1966) ("[A] suit to compel compliance with an administrative subpoena is, by nature of the relief sought, a mandatory injunction proceeding, equitable in character. . . .").

Because Monumental has demonstrated that the Neonatology documents are already in the IRS's possession, the IRS has not satisfied this aspect of the *Powell* requirements.  The district court therefore committed a clear error in enforcing the summons with respect to those documents.

### 3.        *Relevance of the documents requested*

Monumental next challenges the relevance of many of the documents requested.  Applying the *Powell* test for relevance, the question is whether the records requested "might" throw light upon the correctness of a return. *Arthur Young*, 465 U.S. at 814-15 & n.11.  This threshold is "very low," *United States v. Noall*, 587 F.2d 123, 125 (2d Cir. 1978), but judicial protection against sweeping or irrelevant orders is "particularly appropriate in matters where the demand for records is directed not to the taxpayer but to a third-party." *Theodore*, 479 F.2d at 754 (citation and quotation marks omitted) (emphasis removed).

Marien's affidavit asserts that all of the documents requested are relevant to the investigation of Johnson.  He further states that the determination of deductions claimed by Johnson and the characterization of insurance arrangements is a complex and fact-intensive inquiry.  The district court found that Marien's affidavit sufficiently established relevance because courts "have consistently recognized that declarations or affidavits by IRS directors or agents generally satisfy the *Powell* requirements." *See, e.g.*, *United States v. Stuart*, 489 U.S. 353, 360-61 (1989) (holding that the *Powell* requirements were satisfied by an IRS employee's affidavit); *Will*, 671 F.2d at 966 (holding that the requisite showing for the *Powell* factors is generally made by an affidavit of the issuing agent).

On appeal, Monumental contends that many of the documents sought by the IRS relate not to Johnson, but to other unnamed taxpayers.  According to Monumental's brief, paragraphs three through seven of the summons request "practically everything related to various insurance policies as a whole, including insurance pricing, agent commission, marketing allowances, and reinsurance information, as they are sold to insureds all over the country."  Monumental therefore argues that the summons is overbroad and disproportionate to the ends sought. *See Theodore*, 479 F.2d at 754 (reversing the district court's order enforcing a summons because it was "unreasonable").   The magistrate judge agreed with Monumental that "Request 3(a)," which seeks "[a]ll documents memorializing, describing, identifying, and/or listing insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999 " seemed particularly irrelevant because the IRS was only investigating Johnson's tax liability between 1994 and 1997.

In response, the IRS contends that it is authorized to determine the "course and conduct" of its audits. *See United States v. Northwest Corp.*, 116 F.3d 1227, 1233 (8th Cir. 1997).  It further argues  that the details on Monumental's product lines will assist the IRS in classifying the true nature of Johnson's benefit plan.  To fully understand the purpose of the payments made to the plan, and to discern whether the payments are intended to accumulate value, the IRS asserts that it must examine the general operation of Monumental's group policies.

Proceedings seeking enforcement of an IRS summons are intended to be summary in nature, and "defining the permissible scope of the hearing is a decision left to the discretion of the district court." *Will*, 671 F.2d at 968 (permitting the district court to decide if further discovery on the *Powell* factors is warranted).  Nevertheless, in close cases, the "mere assertion of relevance" by an

IRS agent will not necessarily satisfy the government's burden. *United States v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980). The present case exemplifies an exceptional circumstance where automatic reliance upon an agent's affidavit is not adequate because (1) the subpoena is directed to a third party, not to the taxpayer being investigated, (2) the IRS seeks a voluminous amount of highly sensitive proprietary information about Monumental's general administration of its products, (3) the IRS has opposed the imposition of a protective order, and (4) the magistrate judge, who spent years considering the scope of the summons, found that the IRS was seeking "some irrelevant information."

We agree with the magistrate judge that some of the documents requested by the IRS appear to be far removed from the investigation of Johnson's tax liability. The district court's abbreviated analysis of this issue does not persuade us otherwise. In this case, where a large burden is imposed upon a third party to produce proprietary documents that the IRS has refused to place under a protective order, Marien's word that all of the documents summoned are relevant should not be the end of the district court's inquiry.

We would normally remand this case with instructions for the district court to limit enforcement of the summons to relevant documents that are not already in the IRS's possession. Narrowing the scope of the documents that may be summoned constitutes the partial enforcement of a summons, which an unpublished case in this circuit has found permissible. *See Alpha Medical Mngt.*, 1997 WL 339065 at *3 (limiting enforcement of the summons to documents not already "accessible to the IRS"). *See also* Part II.C. below (distinguishing partial enforcement from conditional enforcement of a summons). In this case, however, the magistrate judge has held six hearings and undertaken extensive efforts to work out a compromise. The fact that the parties could not reach a mutually agreeable solution leads us to believe that a remand to the district court to determine which documents are relevant and which are not would prompt a long, drawn-out, and contentious process. In proceedings that have already spanned several years, we think the best course, in terms of both administrative and judicial efficiency, is to deny enforcement of the summons in full and permit the IRS, if it wishes, to redraft a more narrowly tailored summons that complies with the *Powell* requirements.

## C.     Protective Order

Because we are reversing that district court's order enforcing the summons, we do not need to decide the question of whether Monumental is entitled to a protective order. We should clarify, however, the distinction between granting partial enforcement of a summons and conditionally enforcing a summons, because this distinction has become muddied throughout these proceedings. Monumental's request for a protective order covering the documents sought by the IRS would constitute conditional enforcement of the summons because restrictions would be imposed on the IRS's *use* of summoned materials. Partial enforcement, in contrast, narrows the *scope* of the summons by limiting the type and amount of documents that the summoned party must produce. Although this court has permitted a summons to be limited in scope, *see Alpha Medical*, 1997 WL 359065, at *3, we have never addressed the question of whether conditional enforcement is permissible—a question that has been addressed by both the Fifth and Ninth Circuits. *See Jose*, 131 F.3d at 1326-29 (requiring the IRS to give the summoned parties five-days notice before transferring the documents to other divisions within the IRS was held to constitute impermissible conditional enforcement); *United States v. Barrett*, 837 F.2d 1341, 1350 (5th Cir. 1988) (holding that district courts cannot place conditions on enforcement of a summons, but must simply decide "whether to enforce or not to enforce the summons"). This circuit's position on the issue need not be decided at the present time in light of our disposition of the enforcement request.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and deny enforcement of the IRS summons.

# Summons

**Department of the Treasury**
**Internal Revenue Service**

In the matter of ___Johnson Systems, Inc., PO Box 11009, Waco, TX 76716___
Internal Revenue District of ___South Texas___ Periods ___9/30/94; 9/30/95; 9/30/96; 9/30/97___
The Commissioner of Internal Revenue _____
To ___Joanne Heppermann, V. Pres., Monumental Life Insurance Co. or designated agent___
At ___400 W. Market St., Louisville, KY 40202___

You are hereby summoned and required to appear before ___Richard J. Starr (59-01046) or designated agent___
an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

See Attachment 1

See Attachment 2

"I hereby certify that I have examined and compared this copy of the summons with the original and that it is a true and correct copy of the original."

_____ 62-03383   INTERNAL REVENUE AGENT
Signature of IRS Official Serving the Summons     Title

Business address and telephone number of Internal Revenue Service officer named above:
___3848 W. Columbus Drive, Tampa, FL 33607___     ___(813) 348-1805___

Place and time for appearance:
at ___3848 W. Columbus Drive, Tampa, FL 33607___
on the ___21st___ day of ___December___ , 19 _99_ at _9_ o'clock ___ m.
Issued under authority of the Internal Revenue Code this ___4th___ day of _NOVEMBER_ , 19 _99_

_____ (74.01132)   Revenue Agent
Signature of Issuing Officer                  Title

_____   Group Manager
Signature of Approving Officer (if applicable)     Title

**Part A — To be given to person summoned**     Form 2039 (Rev. 04-97)

APX-00024

ATTACHMENT 2

1.  Provide all C-Group, MG-5 or any other life insurance policies and/or certificates, including any amendments, riders or other modifications thereto, issued on the lives of the employees of Johnson Systems through their participation in TAP which were in effect during the period beginning October 1, 1993 through September 30, 1999.

2.  For each of the life insurance policies and/or certificates you provided in response to item 1, provide the following information:

    (a)  All documents relating to such products, including, but not limited to, insurance proposals; cost/benefit or any other financial analyses and/or projections; applications for life insurance coverage; underwriting information, documents specifying contract holders, policyowners, certificate holders and/or beneficiaries; periodic account statements specifying premiums received, dividends, interest, experience credits and/or refunds, cash values, reserves (or the equivalent), conversion credit account accumulations, costs of insurance, morbidity and mortality costs and/or administrative charges.

    (b)  All documents listing, describing and/or identifying the status of each life insurance product as of September 30, 1999.

    (c)  If any of the products paid death benefits, provide all documents relating to such benefit payments.

    (d)  If any of the products matured, terminated, lapsed or converted, provide all documents relating to such maturity, termination, lapse or conversion.

    (e)  All documents describing, identifying, calculating and/or analyzing the method of determining the amount of any annual economic benefit attributable to the value of providing current life insurance protection to the employees of Johnson Systems for each year from 1994 through 1998. This request includes, but is not limited to, all documents relating to the preparation and/or issuance of any Forms W-2, W-2P, 1099, 1099-R or the equivalent.

    (f)  All documents describing, identifying, analyzing and/or reporting the commissions, or the equivalent, paid in regard to each product for the period October 1, 1993 through September 30, 1999.

3.  Provide the following information relating to the C-Group product:

    (a)  All documents memorializing, describing, identifying and/or listing the insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999.

    (b)  All documents determining, calculating, projecting and/or analyzing the insurance costs and/or premium rates including, but not limited to, the following:

        i)    Product specifications,
        ii)   Pricing documents,
        iii)  Profits tests,
        iv)   Non-guaranteed element reports,
        v)    Underwriting requirements,

    vi)      Conversion credit account accumulations,
    vii)    Cash values (or the equivalent),
    viii)   Surrender costs,
    ix)     Loan options,
    x)      Statutory reserves,
    xi)     Tax reserves,
    xii)    Experience credits and/or refunds
    xiii)   Morbidity and mortality costs,
    xiv)   Administrative charges,
    xv)    Actuarial documents and/or studies,
    xvi)   Premium costs, and
    xvii)   Premium payment options.

(c)    All documents filed with the Texas, Illinois and/or Kentucky departments of insurance and/or finance.

(d)    All documents relating to the implementation and operation of any Reinsurance and/or Coinsurance Agreement(s) including, but not limited to, the following:

    i)      Calculation of any mortality charges and/or YRT premiums,
    ii)     Calculation, reporting, accounting and/or maintenance of the reserves for any conversion credit allowances and/or any conversion credit accumulation accounts,
    iii)    Calculation and/or maintenance of any reserves for death benefits,
    iv)    Calculation, payment and/or crediting of any experience refunds,
    v)     Calculation, payment and/or crediting of any commissions and/or expense allowances,
    vi)    Documents required to be provided to the reinsurer or coinsurer in accordance with the agreement(s),
    vii)   Documents relaxing to, or otherwise memorializing or describing, any audits performed by the reinsurer or coinsurer to ensure or verify compliance with the terms of the agreement(s),
    viii)  Documents required to be filed with any state department of insurance, state department of finance, or other state agency relating to the agreement(s),
    ix)    Documents required to be submitted by Monumental for reimbursement or payment pursuant to the terms of the agreement(s),
    x)     Applications for reinsurance and/or coinsurance,
    xii)    Copies of such agreement(s), including all amendments or modifications thereto, and
    xi)    All rate books, application forms, premium and nonforfeiture value manuals, reserve tables and other documents provided by Monumental pursuant to the terms of the agreement(s).

(e)    All documents memorializing, describing, identifying, listing and/or analyzing all issuances, maturities, terminations, lapses and/or conversions during the period July 1, 1991 through September 30, 1999. This request includes, but is not limited to, documents providing any or all of the following information for each certificate: case number, policy number, certificate number, contractholder, policyholder, certificateholder, beneficiary name, employer name and address, agent name and address, amount of insurance, issue date, paid to date, premiums paid, date of maturity, termination, lapse or conversion.

(f)     All documents memorializing, describing, identifying and/or analyzing the events under which a covered employee may convert to an individual policy including all documents explaining these events and explaining the conversion process.

(g)     All documents memorializing, describing, identifying, determining, calculating, projecting and/or analyzing the conversion provisions including, but not limited to, all documents listing the life insurance products to which the C-Group product can be converted, the amount of life insurance coverage provided after conversion, any and all benefits obtained as a result of such conversion and the costs of conversion.

(h)     All sales, marketing, promotional and/or training documents, whether or not such documents were provided to Johnson Systems or its employees or agents.

4.     Provide the following information relating to the C-Group Conversion UL policy:

(a)     All documents memorializing, describing, identifying and/or listing the insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999.

(b)     All documents determining, calculating, projecting and/or analyzing the insurance costs and/or premium rates including, but not limited to, the following:

1)       Product specifications,
ii)      Pricing documents,
iii)     Profits tests,
iv)      Non-guaranteed element reports,
v)       Underwriting requirements,
vi)      Conversion credit account applications.
vii)     Cash values (or the equivalent),
viii)    Surrender costs,
ix)      Loan options,
x)       Statutory reserves,
xi)      Tax reserves,
xii)     Experience credits and/or refunds,
xiii)    Morbidity and mortality costs,
xiv)     Administrative charges,
xv)      Actuarial documents and/or studies,
xvi)     Premium costs, and
xvii)    Premium payment options.

(c)     All documents filed with the Texas, Illinois and/or Kentucky departments of insurance and/or finance.

(d)     All documents memorializing, describing, identifying and/or analyzing all issuances, maturities, terminations or lapses during the period July 1, 1991 through September 30, 1999. This request includes, but is not limited to, documents providing any or all of the following information for each policy: case number, policy number, policyholder, insured name and address, beneficiary name, agent name and address, amount of insurance, issue date, paid to date, premiums paid, conversion credit applications, cash value projections, policy loans, date of maturity, termination, lapse or conversion.

> (e)     All sales, marketing, promotional and/or training documents, whether or not such documents were provided to Johnson Systems or its employees or agents.

If any C-Group products were converted to any other conversion policies, provide the following information relating to such policies:

> (a)     All documents memorializing, describing, identifying and/or listing the insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999.

> (b)     All documents determining, calculating, projecting and/or analyzing the insurance costs and/or premium rates including, but not limited to, the following:

>> i)       Product specifications,
>> ii)      Pricing documents,
>> iii)     Profits tests,
>> iv)      Non-guaranteed element reports,
>> v)       Underwriting requirements,
>> vi)      Conversion credit account applications,
>> vii)     Cash values (or the equivalent),
>> viii)    Surrender costs,
>> ix)      Loan options,
>> x)       Statutory reserves,
>> xi)      Tax reserves,
>> xii)     Experience credits and/or refunds,
>> xiii)    Morbidity and mortality costs,
>> xiv)     Administrative charges,
>> xv)      Actuarial documents and/or studies,
>> xvi)     Premium costs, and
>> xvii)    Premium payment options.

> (c)     All documents filed with the Texas, Illinois and/or Kentucky departments of insurance and/or finance.

> (d)     All documents memorializing, describing, identifying and/or analyzing all issuances, maturities, terminations or lapses during the period July 1, 1991 through September 30, 1999. This request includes, but is not limited to, documents providing any or all of the following information for each policy: case number, policy number, policyholder, insured name and address, beneficiary name, agent name and address, amount of insurance, issue date, paid to date, premiums paid, conversion credit applications, cash value projections, policy loans, date of maturity, termination, lapse or conversion.

> (e)     All sales, marketing, promotional and/or training documents, whether or not such documents were provided to Johnson Systems or its employees or agents.

6.     Provide the following information relating to the MG-5 product:

> (a)     All documents memorializing, describing, identifying and/or listing the insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999.

(b)    All documents determining, calculating, projecting and/or analyzing the insurance costs and/or premium rates including, but not limited to, the following:

    i)        Product specifications,
    ii)       Pricing documents,
    iii)     Profits tests,
    iv)     Non-guaranteed element reports,
    v)       Underwriting requirements,
    vi)     Statutory reserves,
    vii)    Tax reserves,
    viii)   Morbidity and mortality costs,
    ix)     Administrative charges,
    x)       Actuarial documents and/or studies,
    xi)     Premium costs,
    xii)    Renewal premium costs, and
    xiii)   Premium payment options.

(c)    All documents filed with the Texas, Illinois and/or Kentucky departments of insurance and/or finance.

(d)    All documents relating to the implementation and operation of any Reinsurance and/or Coinsurance Agreement(s) including, but not limited to, the following:

    i)        Calculation of any mortality charges and/or YRT premiums,
    ii)       Calculation and/or maintenance of any reserves for death benefits,
    iii)     Calculation, payment and/or crediting of any experience refunds,
    iv)     Calculation, payment and/or crediting of any commissions and/or expense allowances,
    v)       Documents rcquired to be provided to the reinsurer or coinsurer in accordance with the agreement(s),
    vi)     Documents relating to, or otherwise memorializing or describing, any audits performed by the reinsurer or coinsurer to ensure or verify compliance with the terms of the agreement(s),
    vii)    Documents required to be filed with any state department of insurance, state department of finance, or other state agency relating to the agreement(s),
    viii)   Documents required to be submitted by Monumental for reimbursement or payment pursuant to the terms of the agreement(s),
    ix)     Applications for reinsurance and/or coinsurance,
    x)       Copies of such agreement(s), including all amendments or modifications thereto, and
    xi)     All rate books, application forms, premium and nonforfeiture value manuals, reserve tables and other documents provided by Monumental pursuant to the terms of the agreement(s).

(e)    All documents memorializing, describing, identifying, listing and/or analyzing all issuances, maturities, terminations, lapses and/or conversions during the period July 1, 1991 through September 30, 1999. This request includes, but is not limited to, documents providing any or all of the following information for each certificate: case number, policy number, certificate number, contractholder, policyholder, certificateholder, beneficiary name, employer name and address, agent name and address, amount of insurance, issue date, paid to date, premiums paid, date of maturity, termination, lapse or conversion.

(f)     All documents memorializing, describing, identifying and/or analyzing the events under which a covered employee may convert to an individual policy including all documents explaining these events and explaining the conversion process.

(g)     All documents memorializing, describing, identifying, determining, calculating, projecting and/or analyzing the conversion provisions including, but not limited to, all documents listing the life insurance products to which the MG-5 product can be converted, the amount of life insurance coverage provided after conversion, any and all benefits obtained as a result of such conversion and the costs of conversion.

(h)     All sales, marketing, promotional and/or training documents, whether or not such documents were provided to Johnson Systems or its employees or agents.

7.     If any other life insurance product was issued on the lives of employees of employers participating in TAP, provide the following information:

(a)     All documents memorializing, describing, identifying and/or listing the insurance costs and/or premium rates in effect during the period beginning July 1, 1991 through September 30, 1999.

(b)     All documents determining, calculating, projecting and/or analyzing the insurance costs and/or premium rates including, but not limited to, the following:

   i)       Product specifications,
   ii)      Pricing documents,
   iii)     Profits tests,
   iv)     Non-guaranteed element reports,
   v)      Underwriting requirements,
   vi)     Statutory reserves,
   vii)    Tax reserves,
   viii)   Morbidity and mortality costs,
   ix)     Administrative charges,
   x)      Actuarial documents and/or studies,
   xi)     Premium costs,
   xii)    Renewal premium costs, and
   xiii)   Premium payment options.

(c)     All documents filed with the Texas, Illinois and/or Kentucky departments of insurance and/or finance.

(d)     All documents relating to the implementation and operation of any Reinsurance and/or Coinsurance Agreement(s) including, but not limited to, the following:

   i)       Calculation of any mortality charges and/or YRT-premiums,
   ii)      Calculation and/or maintenance of any reserves for death benefits,
   iii)     Calculation, payment and/or crediting of any experience refunds,
   iv)     Calculation, payment and/or crediting of any commissions and/or expense allowances,
   v)      Documents required to be provided to the reinsurer or coinsurer in accordance with the agreement(s),
   vi)     Documents relating to, or otherwise memorializing or describing, any audits performed by the reinsurer or coinsurer to ensure or verify compliance with the terms of the agreement(s),

vii) Documents required to be filed with any state department of insurance, state department of finance, or other state agency relating to the agreement(s),

viii) Documents required to be submitted by Monumental for reimbursement or payment pursuant to the terms of the agreement(s),

ix) Applications for reinsurance and/or coinsurance,

x) Copies of such agreement(s), including all amendments or modifications thereto, and

xi) All rate books, application forms, premium and nonforfeiture value manuals, reserve tables and other documents provided by Monumental pursuant to the terms of the agreement.

(e) All documents memorializing, describing, identifying, listing and/or analyzing all issuances, maturities, terminations, lapses and/or conversions during the period July 1, 1991 through September 30, 1999. This request includes, but is not limited to, documents providing any or all of the following information for each certificate: case number, policy number, certificate number, contractholder, policyholder, certificateholder, beneficiary name, employer name and address, agent name and address, amount of insurance, issue date, paid to date, premiums paid, date of maturity, termination, lapse or conversion.

(f) All documents memorializing, describing, identifying and/or analyzing the events under which a covered employee may convert to an individual policy including all documents explaining these events and explaining the conversion process.

(g) All documents memorializing, describing, identifying, determining, calculating, projecting and/or analyzing the conversion provisions including, but not limited to, all documents listing the life insurance products to which the other life insurance product can be converted, the amount of life insurance coverage provided after conversion, any and all benefits obtained as a result of such conversion and the costs of conversion.

(h) All sales, marketing, promotional and/or training documents, whether or not such documents were provided to Johnson Systems or its employees or agents.

8. If applicab1e, provide all annuity contracts, including all amendments, riders or other modifications thereto, issued by Monumental in regard to the employees of Johnson Systems through their participation in TAP, which were in effect during the period beginning October 1, 1993 through September 30, 1999.

9. For each of the annuity contracts you provided in response to item 8, provide the following information.

(a) Provide all documents relating to such annuity contracts. This request includes, but is not limited to, annuity proposals cost/benefit or any other financial analyses and/or projections; annuity computation worksheets; annuity applications; contractholder, annuityowner, annuitants and/or beneficiaries, benefit payment applications; periodic annuity account statements specifying premiums, deposits (or the equivalent) received, annuity earnings, periodic annuity values and administrative charges; and explanations of the benefits provided under the annuity contracts and conditions required for benefit payment.

(b) Provide all documents describing and/or identifying the status of each annuity contract as of September 30, 1999.

(c)    For each of the annuities that paid benefits, provide all documents relating to such payments.

(d)    For each of the annuities that was canceled, terminated, distributed or the equivalent, provide all documents relating to such cancellation, termination or distribution.

(e)    Provide all documents describing, identifying and/or analyzing the method of determining the amount of any reportable benefit provided to each Johnson Systems employee as a result of his/her participation in the annuity contracts from October 1, 1993 to September 30, 1999. This request includes, but is not limited to, all documents relating to the preparation and/or issuance of any Forms W-2, W-2P, 1099, 1099-R or the equivalent.

(f)    Provide all documents identifying and/or describing the commissions, or the equivalent, paid in regard to each annuity contract for the employees of Johnson Systems for the period October 1, 1993 through September 30, 1999.

(g)    Provide all marketing and/or promotional documents relating to the annuity products described above, including, but not limited to, sales and/or training documents, whether or not such documents were provided to Johnson Systems or its employees or agents.

10.    Provide all documents describing the relationship between you and TAP with respect to the life insurance and annuity products described above.

11.    Provide all agreements you entered into with TAP regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

12.    Provide all documents describing the relationship between you and Tax Awareness with respect to the life insurance and annuity products described above.

13.    Provide all agreements you entered into with Tax Awareness regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

14.    Provide all documents describing the relationship between you and Wells Fargo with respect to the life insurance and annuity products described above.

15.    Provide all agreements you entered into with Wells Fargo regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

16.    Provide all documents describing the relationship between you and CJA with respect to the life insurance and annuity products described above.

17.    Provide all agreements you entered into with CJA regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

18    Provide all documents describing the relationship between you and any other life insurance company with respect to the life insurance and annuity products described above.

19.     Provide all agreements you entered into with any other insurance company regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

20.     Provide all documents describing the relationship between you and Paul Hinson, in his capacity as a life insurance agent.

21.     Provide all agreements you entered into with Paul Hinson, in his capacity as a life insurance agent, regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

22.     Provide all agreements you entered into with any other entities or individuals regarding the marketing, advertising, and sales of any and all of the life insurance and/or annuity products described above.

23.     Provide all documents describing the relationship between you and Johnson Systems and/or the employees of Johnson Systems with respect to the life insurance and annuity products described above.

24.     Provide any and all written policies and/or instructions pertaining to your record retention procedures.

With respect to the records and/or information requested in the items above, Monumental should appear through and by such person or persons who can authenticate the documents produced and who has knowledge or to whom knowledge is reasonably available concerning the activities, events, transactions and entities reflected in the records to be produced in response to this summons.